REITLER KAILAS & ROSENBLATT LLP
Brian D. Caplan
Julie B. Wlodinguer
885 Third Avenue, 20th Floor
New York, NY 10022
Phone: (212) 209-3050
Fax: (212) 371-5500
Email: bcaplan@reitlerlaw.com
Email: jwlodinguer@reitlerlaw.com
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ORVILLE HALL and PHILLIP PRICE, collectively
professionally known as "THE SHOWBOYS",

                                      Plaintiffs,

           -against-

PROTOONS INC.

                                     Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Case No. 26-cv-3726

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs Orville Hall and Phillip Price, collectively professionally known as "The Showboys" (hereinafter, "Plaintiffs"), by their attorneys, Reitler Kailas & Rosenblatt LLP, as and for their Complaint against the defendant Protoons Inc. ("Defendant" or "Protoons") herein, allege as follows:

**NATURE OF THE ACTION**

1.      Plaintiffs, the writers of "Drag Rap," an iconic and oft-sampled hip hop song, among other musical works, bring this action against their former music publisher in the United States, Protoons, to affirm this Court's prior decision that Plaintiffs' 1985 grant to Protoons of copyrights in their musical compositions for the territory of the United States was validly

1

terminated pursuant to Section 203 of the United States Copyright Act of 1976 (the "Copyright Act") and obtain a Court order requiring Protoons to cease and desist from asserting otherwise.

2.    Plaintiffs also seek a declaratory judgment from the Court as to the percentage interest Plaintiffs have in royalties derived from worldwide exploitations of Plaintiffs' musical compositions (i.e., non-territory bound income), which are now jointly administered by Plaintiffs (in the United States) and Protoons (outside of the United States), and an accounting and payment to Plaintiffs of same.

3.    Plaintiffs further seek to redress Protoons' contractual failure to properly or timely account and pay to Plaintiffs the royalties due to them in connection with the commercial exploitation of their musical works and derivatives, interpolations, and samples thereof outside of the United States from January 1, 2022 to the present.

## THE PARTIES

4.    Plaintiff Orville "Bugs Can Can" Hall ("Hall") is a resident and citizen of the State of Louisiana.

5.    Plaintiff Phillip "Triggerman" Price ("Price") is a resident and citizen of the State of Louisiana.

6.    Hall and Price together are professionally known as "The Showboys", a hip-hop duo.

7.    Upon information and belief, defendant Protoons is a New York corporation with a principal place of business located in New York, New York.

8.    Protoons is a music publishing company in the business of administering, licensing, and exploiting musical compositions.

**JURISDICTION AND VENUE**

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338. This Court has federal question jurisdiction in this matter in that Plaintiffs seek a declaratory judgment against Defendant pursuant to the United States Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq*.

10.     This Court also has jurisdiction over this action pursuant to 28 U.S.C. §1332(a) in that there is complete diversity of citizenship between the parties and the amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.

11.     This Court also has supplemental jurisdiction over Plaintiffs' Second, Third and Fourth Causes of Action pursuant to 28 U.S.C. § 1367 inasmuch as they arise out of the same set of operative facts as are at issue in the other claim asserted by Plaintiffs in this action, over which this Court has original jurisdiction, and, therefore, they form part of the same case or controversy under Article III of the United States Constitution as the other claim asserted by Plaintiffs herein.

12.     Venue lies in this district pursuant to 28 U.S.C. §1391(a) in that a substantial part of the events giving rise to the claims herein occurred in the Southern District of New York, and at the time of commencing this action, Defendant is subject to personal jurisdiction in this District.

**BACKGROUND**

13.     In the mid-1980s, Hall and Price were on the cusp of breaking into the New York music scene as R&B and hip-hop performers when they secured a recording contract with Profile Records, Inc. ("Profile Records").

14.     Profile Records was, upon information and belief, a successful record label during the 1980s and 1990s and at all relevant times therein, was a corporate affiliate of Protoons.

15.     Upon information and belief, Sony Music Entertainment is the current successor-in-interest to Profile Records.

16.     On or about May 20, 1985, Plaintiffs, on the one hand, and Profile Records and Protoons, on the other hand, entered into an exclusive recording and publishing agreement (the "Agreement").  A true and correct copy of the Agreement is annexed hereto as Exhibit 1, and is incorporated by reference herein and made a part hereof.

17.     Pursuant to the Agreement, Plaintiffs agreed to record and deliver master recordings embodying their performances to Profile Records for commercial exploitation in exchange for royalties.

18.     Per paragraph 11(a) of the Agreement, Plaintiffs conveyed and assigned to Protoons all of their right, title and interest in all of the compositions written, in whole or in part, by Hall and/or Price that were embodied in the recordings delivered by Plaintiffs to Profile (the "Recorded Compositions").

19.     As such, per paragraph 11(b) of the Agreement, Protoons, as "Publisher", had "the sole and exclusive perpetual worldwide rights of administration, exploitation and promotion with respect to the Recorded Compositions, including, without limitation the sole and exclusive perpetual worldwide right to…collect and receive any and all monies derived from the exploitation of the Recorded Compositions throughout the world, excluding the writer's share of public performance royalties."

20.     In return, Protoons agreed to pay Plaintiffs royalties in accordance with the royalty guidelines annexed as Exhibit A to the Agreement (the "Writer Royalty Guidelines").

21.     Paragraph 11(h) of the Agreement provides that:

Publisher shall account to you [Plaintiffs] for royalties and other sums payable pursuant to this Paragraph 11 upon the same terms and conditions as Company [Profile Records] is required to account to you pursuant to paragraph 7 hereof. Your rights and Publisher's obligations with respect to such accountings shall be the same as your rights and Company's obligation pursuant to paragraph 7 hereof. All accounting statements and payments for royalties payable pursuant to this

4

Paragraph 11 shall be included as a part of the accountings referred to in Paragraph 7 hereof.

22.     Paragraph 7 of the Agreement provides for semi-annual accountings to Plaintiffs "on or before the first day of September for the period ending the preceding June 30th, and on or before the first day of March for the period ending the preceding December 31st, together with payment of accrued royalties, if any, earned by [Plaintiffs] during such preceding half-year."

23.     Per paragraph 11(a)(1) of the Agreement and paragraphs (e), (f), and (g) of the Writer Royalty Guidelines annexed to the Agreement, Protoons is obligated to pay Plaintiffs fifty percent (50%) of the sums actually received by Protoons in the United States with respect to the exploitation and use of the Recorded Compositions outside of the United States.

24.     The Agreement was amended by written agreement dated September 29, 1987 to provide for the recording and delivery of a musical composition by Plaintiffs for inclusion on a Profile Records Christmas Compilation Album.  A true and correct copy of the 1987 amendment to the Agreement is annexed hereto as Exhibit 2.

### *Plaintiffs Deliver the Recorded Compositions to Profile Records and Protoons*

25.     Plaintiffs delivered four (4) master recordings to Profile Records pursuant to the Agreement, as amended, entitled "Cold Frontin'," "Drag Rap," "That's What I Want For Christmas", and "The Ten Laws of Rap".

26.     The musical compositions embodied on each of these master recordings (the "Cold Frontin' Composition", the "Drag Rap Composition," the "That's What I Want For Christmas Composition", and the "The Ten Laws of Rap Composition", respectively) were written, in whole or in part, by Hall and/or Price, and constituted "Recorded Compositions" subject to the publishing provisions of the Agreement.

5

27. Profile Records commercially released Plaintiffs' recordings of the Ten Laws of Rap Composition and the Cold Frontin' Composition in or about 1985.

28. Profile Records commercially released Plaintiffs' recording of the Drag Rap Composition (the "Drag Rap Recording" and together with the Drag Rap Composition, "Drag Rap") in or about 1986.

29. The Drag Rap Recording, which embodied the Plaintiffs' recorded performance of the Drag Rap Composition – a 6-minute rap story of revenge-seeking gangsters unfolding over a richly syncopated beat – was a hit in the New York rap scene.

30. The Showboys did not author or co-author any compositions other than the Recorded Compositions, and Hall and Price went on to pursue careers their respective careers in marketing and administration.

31. Although Drag Rap's initial success appeared to be short-lived, Drag Rap's popularity surged in the South in the 1990s, particularly in Memphis, Tennessee and New Orleans, Louisiana, and is credited as being the foundation of much Southern rap – a/k/a "bounce" – music.

32. Upon information and belief, since 1991, the Drag Rap Recording has been widely sampled in approximately 175 different recordings by various artists including Three 6 Mafia, Lil Jon, Lil Wayne, T.I., Drake, Chris Brown, Gucci Mane, and Megan Thee Stallion, among many others.

33. The Drag Rap Recording continues to be sampled and/or interpolated to this day, including several uses since 2022, many by big names in the music industry, such as rap superstar Cardi B.

***Plaintiffs Terminated Their Copyright Grant To Protoons***

34.    The term of the Agreement, as amended, was terminated by written letter dated May 18, 1988 (the "1988 Termination").  A true and correct copy of the 1988 Termination is annexed hereto as Exhibit 3.

35.    Although the 1988 Termination ended the term of the Agreement, Protoons still had the right to administer and commercially exploit Plaintiffs' musical works and was still obligated to account and pay over royalties to Plaintiffs for the use of those works and derivatives thereof pursuant to the terms of the Agreement.

36.    In 2018, Plaintiffs, through their then-counsel, Lita Rosario, Esq., duly served a copyright termination notice upon Protoons terminating Plaintiffs' grant of copyright to Protoons with respect to the Recorded Compositions (the "Termination Notice").  A true and correct copy of the Termination Notice is annexed hereto as Exhibit 4.

37.    Pursuant to the Termination Notice, Protoons' rights in the Drag Rap Composition terminated effective as of January 1, 2022.

38.    Protoons initially failed and refused to recognize the validity of the Termination Notice, both generally and with respect to the Drag Rap Composition in particular.

39.    Plaintiffs filed an action against Protoons in 2021 to redress Protoons' decades-long failure to pay royalties to Plaintiffs, entitled *Orville Hall and Phillip Price, collectively professionally known as "The Showboys" v. Protoons Inc.*, Case No. 21-cv-2043-AT-KHP (the "2021 Action").

40.    In connection with the 2021 Action, Protoons filed four counterclaims against Plaintiffs: two counterclaims for breach of contract by reason of Plaintiffs' purportedly infringing use of a third party's music material in the Drag Rap Composition, a third counterclaim for breach

7

of the covenant of good faith and fair dealing, and a fourth counterclaim against Plaintiffs seeking, among other things, a declaration from this Court that "with respect to any termination notices sent by [Plaintiffs] to [Protoons] in the past or in the future, such termination notices are invalid." A true and correct copy of Protoons' Answer and Counterclaims in the Action (without exhibits) is annexed as Exhibit 5 hereto.

41. Following discovery in the 2021 Action, the parties cross-moved for summary judgment.

42. In an order dated and entered on August 22, 2024 (the "SJ Order"), the Court granted summary judgment in favor of Plaintiffs with respect to Plaintiffs' breach of contract claim as well as Protoons' first, second, and third counterclaims. A true and correct copy of the SJ Order is annexed as Exhibit 6 hereto.

43. The Court also dismissed Protoons' fourth counterclaim for declaratory judgment relating to the validity of Plaintiffs' Termination Notice.

44. On September 3, 2024, per the Court's directive in the SJ Order, Plaintiffs filed a proposed judgment in the 2021 Action consistent with the SJ Order providing that judgment is entered in favor of Plaintiffs on their claim and Protoons' first, second, and third counterclaims, and dismissing Protoons' fourth counterclaim with prejudice.

45. Protoons filed an objection to Plaintiffs' proposed judgment in the 2021 Action, requesting that its fourth counterclaim for declaratory relief should not be dismissed with prejudice, but rather "without prejudice to [Protoons] seeking declaratory relief in the future based on additional facts".

46. On September 19, 2024, Protoons made a motion for reconsideration or reargument, or in the alternative for clarification, of the SJ Order (the "Reconsideration Motion").

8

47.     On October 22, 2025, Protoons made a motion for leave to file an amended answer and counterclaims (the "Amendment Motion").

48.     In its reply memorandum of law filed on January 8, 2026 in connection with the Amendment Motion, Protoons stated as follows:

> For the avoidance of doubt, Defendants [sic] maintain that they own all of the copyrights by virtue of the parties' longstanding agreement, with an obligation to pay Plaintiff's [sic] 50% of the royalties. Defendants [sic] further maintain that Plaintiff's [sic] attempts to terminate those rights were ineffective.

49.     The Reconsideration Motion was denied by the Court in an Order dated February 26, 2026, which Order directed Plaintiffs to file a second amended proposed judgment consistent with that order.

50.     On March 26, 2026, Plaintiffs filed a second amended proposed judgment in the 2021 Action, again seeking dismissal of Protoons' fourth counterclaim with prejudice.

51.     Protoons did not, as it had with Plaintiffs' initial proposed judgment, object to Plaintiffs' second amended proposed judgment.

52.     Magistrate Judge Katherine H. Parker issued a Report and Recommendation to District Judge Analisa Torres on March 2, 2026 to deny the Amendment Motion.

53.     Protoons interposed objections to Judge Parker's Report and Recommendation, which were opposed by Plaintiffs.

54.     As of the filing hereof, Judge Torres has not issued an opinion, decision or order on the Amendment Motion nor has Judge Torres entered any judgment in the 2021 Action.

55.     To date, notwithstanding the Court's summary judgment dismissal, after discovery, of Protoons' declaratory judgment counterclaim seeking to invalidate the Termination Notice, Protoons continues to maintain that the Termination Notice was not valid and did not effectuate a

9

termination of Plaintiffs' 1985 grant of copyrights in the Drag Rap Composition (among other compositions) to Protoons.

56.    Thus, a ripe and justiciable controversy exists as to whether the Court's SJ Order dismissed Protoons' declaratory judgment counterclaims with or without prejudice, and whether Plaintiffs' copyright termination notice was valid.

### *Protoons' Unlawful Retention of Plaintiffs' Share of Both U.S. and Foreign Revenue From The Recorded Compositions*

57.    Since Plaintiffs' Termination Notice was valid and Protoons' prior counterclaim to declare such Termination Notice invalid was dismissed, Plaintiffs' copyright interests in the Recorded Compositions, at least with respect to the territory of the United States, reverted to Plaintiffs on the effective dates identified in the Termination Notice, while Protoons continued to administer and control the copyrights in the Drag Rap Composition and the other Recorded Compositions with respect to the rest of the world outside of the United States.

58.    To date, Protoons has refused to cooperate in effectuating the reversion of Plaintiffs' U.S. copyrights in the Recorded Compositions with third parties, and Prootons and/or its administrator, Universal Music Publishing Group ("UMPG"), have remained the administrator(s) of record with respect to 100% of Plaintiffs' worldwide copyrights in and to the Recorded Compositions, including the Drag Rap Composition.

59.    The parties have, however, conferred regarding approval and authorizations for proposed uses and exploitations of the Drag Rap Composition by third parties since January 1, 2022, subject to and without waiving their respective rights and positions as to the validity of Plaintiffs' Termination Notice.

60.    With respect to derivative uses of the Recorded Compositions that were prepared prior to January 1, 2022, such derivative uses remain subject to the terms of the Agreement, and Plaintiffs are entitled to 50% of all income received by Protoons related thereto.

61.    Upon information and belief, Protoons and/or UMPG have received all of the revenues derived from their commercial exploitation of Plaintiffs' copyright interests in the Recorded Compositions, including the Drag Rap Composition, and derivative works, samples, and interpolations thereof, from January 1, 2022 to date, without regard for territory of use.

62.    Protoons has failed and refused to account for or turnover any of the proceeds it has received after the effective dates identified in the Termination Notice relating to the use of the Recorded Compositions (and derivative works, samples and interpolations thereof) in the United States, despite no longer having any right to administer those works or collect royalties relating thereto in the United States after the applicable effective dates of Plaintiffs' termination of Protoons' rights therein.

63.    Moreover, with respect to worldwide (i.e., non-territory bound) exploitations of the Recorded Compositions (and derivative works, samples, and interpolations thereof), the parties are at an impasse with respect to the appropriate split of royalties from those uses that are attributable to the U.S. copyrights as distinct from the copyrights in those works for the rest of the world.

64.    Plaintiffs contend that the appropriate split is, based upon the genre of Plaintiffs' music: 75% / 25% (United States / the rest of the world).

65.    Upon information and belief, Protoons contends that the appropriate split is: 50% / 50% (United States / the rest of the world).

66.    Accordingly, Plaintiffs contend that for every dollar received for worldwide licenses of the Recorded Compositions entered into after January 1, 2022, Plaintiffs are entitled to 87.5 cents: 75% (or 75 cents) attributable to U.S. royalties, and 50% of the remaining 25% attributable to foreign royalties, with Protoons being entitled to 12.5 cents.

67.    By contrast, and upon information and belief, Protoons contends that, in the event that the Termination Notice is effective, for every dollar received for worldwide licenses of the Recorded Compositions entered into after January 1, 2022, Plaintiffs would be entitled to receive 75 cents (50% attributable to U.S. royalties plus 50% of the remaining 50% attributable to foreign royalties) with Protoons receiving 25 cents.

68.    There is thus a further ripe and justiciable controversy between the parties as to the proper split of revenue to be applied from worldwide exploitations of the Recorded Compositions to Plaintiffs for the U.S. copyrights and to Protoons for the rest of the world.

69.    Upon information and belief, the United States is the biggest market of the music industry, with the three major record labels and music publishers located there.

***Protoons' Material Breach of the 1985 Agreement With Respect To Ex-U.S. Exploitations***

70.    Pursuant to paragraphs 7 and 11(h) of the Agreement, Protoons was obligated to provide Plaintiffs with accurate semi-annual royalty statements and payments relating to the Recorded Compositions.

71.    Protoons has failed to do so.

72.    Indeed, Protoons has failed and refused to provide any royalty accountings or payments to Plaintiffs whatsoever from January 1, 2022 to the present, despite due demand therefor.

*Protoons' Failure To Cure Its Breach And Unlawful Retention Of U.S.-Related Royalties*

73.    By letter dated December 11, 2024, a copy of which is annexed as Exhibit 7 hereto, Plaintiffs' counsel reiterated the import of the Court's SJ Order, requested a list of all licenses granted by Protoons and/or UMPG with respect to the Drag Rap Composition from and after January 1, 2022 as well as an accounting and payment therefor.

74.    To date, Protoons has not provided any payments or accountings to Plaintiffs with respect to the use of the Drag Rap Composition from and after January 1, 2022.

75.    Plaintiffs' December 11, 2024 letter also notified Protoons of its breach of the 1985 Agreement by its failure to properly account for and pay royalties to Plaintiffs from January 1, 2022 to the present.

76.    Notwithstanding this notice, Protoons has failed and refused to render any royalty accountings or payments to Plaintiffs for the semi-annual accounting periods ending June 30, 2022, December 31, 2022, June 30, 2023, December 30, 2023, June 30, 2024, December 30, 2024, June 30, 2025, and December 30, 2025.

77.    To date, Protoons has not cured its breaches of the 1985 Agreement.

78.    While Protoons responded to the December 11, 2025 letter on January 14, 2025 stating that it would "await the Court's decision on Protoons'" Reconsideration Motion and "then assess the situation based on that outcome," the Reconsideration Motion was decided on February 26, 2026, and no accountings or payments from Protoons have been made to Plaintiffs.  A true and correct copy of Protoons' January 14, 2025 letter is annexed as Exhibit 8 hereto.

79.    Protoons' January 14, 2025 letter continues to assert that "Protoons at its option can continue to hold that money and/or use it to eliminate or reduce the ongoing risk of liability created

13

by the Showboys' failure to clear their unlicensed and uncleared use of the 'Dragnet Theme Song' in 'Drag Rap.'"

80.     Incredibly, despite Protoons' clear and unequivocal breaches of the Agreement and wholesale failure to abide by its contractual and legal obligations to Plaintiffs, *as determined by this Court*, and this Court's unambiguous and total rejection of Protoons' position that The Showboys have breached their purported contractual obligations to Protoons by reason of the Dragnet Theme Song, Protoons persists in making unsubstantiated accusations that The Showboys breached the parties' Agreement and continues to unjustifiably withhold all royalties due to Plaintiffs under the Agreement.

81.     The Showboys have complied with all of their obligations to Protoons under the Agreement in all respects; Protoons' threat to withhold royalties is just a continuation of its decades-long bad faith strategy to exclude Plaintiffs from participating in the fruits of their artistic labors.

82.     No copyright infringement claims have ever been asserted by any third party in Drag Rap's forty-year history.

83.     Moreover, any such claims would have no merit as Plaintiffs are the original composers of the Drag Rap Composition.

**COUNT I**
**Declaratory Judgment Pursuant to 28 U.S.C. § 2201**

84.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 83 above as if fully set forth herein at length.

85.     As described above, Plaintiffs contend that the Court's SJ Order in the 2021 Action dismissed Defendant's counterclaim that the Termination Notice was invalid with prejudice and that the Termination Notice is therefore valid, such that Plaintiffs recaptured their U.S. copyright

14

interests in the Recorded Compositions and are the sole owners and administrators of the copyrights in and to the Recorded Compositions for the territory of the United States.

86. Upon information and belief, Defendant contends that the Court's SJ Order in the 2021 Action did not dismiss Defendant's counterclaim that the Termination Notice was invalid with prejudice and that the Termination Notice was therefore not valid, such that Defendant is the sole administrator of the copyrights in and to the Recorded Compositions for the territory of the United States.

87. By reason of the foregoing, there is a justiciable controversy between Plaintiffs and Defendant regarding the effect of the SJ Order on Defendant's claim that the Termination Notice was invalid, as well as the ownership and administration rights of the parties with respect to the Recorded Compositions in the United States.

88. By reason of the foregoing, Plaintiffs are entitled to a declaration that (i) the Court's SJ Order in the 2021 Action dismissed Defendant's counterclaim that the Termination Notice was invalid with prejudice, (ii) Defendant is collaterally estopped from asserting otherwise or contending that the Termination Notice is not valid, and (iii) the Termination Notice is valid, such that Plaintiffs recaptured their U.S. copyright interests in the Recorded Compositions and are the sole owners and administrators of the copyrights in and to the Recorded Compositions for the territory of the United States.

89. Upon entry of an order granting the sought after Declaratory Judgment, Plaintiffs request that the Court order Defendant to pay Plaintiffs' attorneys' fees, costs and expenses incurred by Plaintiffs in connection with this action.

## COUNT II
### Declaratory Judgment Pursuant to 28 U.S.C. § 2201

90.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 89 above as if fully set forth herein at length.

91.     As described above, Plaintiffs contend that, upon reversion of their copyrights in the Recorded Compositions, Plaintiffs are entitled to 75% of the revenues derived from the worldwide (i.e., non-territory-bound) commercial exploitation of Plaintiffs' copyright interests in the Recorded Compositions, including with respect to commercial exploitation of derivative works, interpolations and samples thereof, as royalties attributable to Plaintiffs' U.S. copyright interests in the Recorded Compositions.

92.     Upon information and belief, Defendant contends that, upon reversion of their copyrights in the Recorded Compositions, if any, Plaintiffs are only entitled to 50% of the revenues derived from the worldwide (i.e., non-territory-bound) commercial exploitation of Plaintiffs' copyright interests in the Recorded Compositions, including with respect to commercial exploitation of derivative works, interpolations and samples thereof, as royalties attributable to Plaintiffs' U.S. copyright interests in the Recorded Compositions.

93.     By reason of the foregoing, there is a justiciable controversy between Plaintiffs and Defendant regarding the parties' rights and obligations with respect to income derived from the worldwide (non-territory-bound) commercial exploitation of Plaintiffs' copyright interests in the Recorded Compositions, including with respect to commercial exploitation of derivative works, interpolations and samples thereof, for the territory of the United States.

94.     By reason of the foregoing, Plaintiffs are entitled to a declaration that, upon reversion of their copyrights in the Recorded Compositions, Plaintiffs are entitled to 75% of the revenues derived from the worldwide (i.e., non-territory-bound) commercial exploitation of

16

Plaintiffs' copyright interests in the Recorded Compositions, including with respect to commercial exploitation of derivative works, interpolations and samples thereof, as royalties attributable to Plaintiffs' U.S. copyright interests in the Recorded Compositions.

<u>**COUNT III**</u>
**Accounting**

95.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 94 above as if fully set forth herein at length.

96.    By reason of the foregoing, Plaintiffs are entitled to an accounting and payment from Defendant of all amounts due to Plaintiffs in connection with Defendant's and/or its administrator's worldwide and U.S. commercial exploitation of Plaintiffs' copyright interests in the Recorded Compositions, including with respect to the commercial exploitation of derivative works, interpolations and samples thereof, from January 1, 2022 to the present.

<u>**COUNT IV**</u>
**Breach of Contract**

97.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 96 above as if fully set forth herein at length.

98.    While Plaintiffs' 1985 grant of copyrights to Defendant was terminated with respect to the United States, the Agreement still remains in force and effect with respect to territories other than the United States.

99.    By reason of the foregoing, including, without limitation, Defendant's failure to account or pay royalties to Plaintiffs with respect to all accounting periods after January 1, 2022 through to the present, Defendant has materially breached the Agreement.

100.    Plaintiffs have satisfactorily performed all of their obligations to Defendant under the Agreement.

17

101.    As a direct and proximate result of Defendant's breaches of the Agreement, Plaintiffs have been damaged in an amount to be determined at trial, but in no event less than Seventy-Five Thousand Dollars ($75,000).

## JURY DEMAND

Pursuant to Fed. R. Civ. P. Rule 38(b), Plaintiffs demand a trial by jury on all issues properly triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment as follows:

(a)    On the First Claim, a declaration that (i) the Court's SJ Order in the 2021 Action dismissed Defendant's counterclaim that the Termination Notice was invalid with prejudice, (ii) Defendant is collaterally estopped from asserting otherwise or contending that the Termination Notice is not valid, and (iii) the Termination Notice is valid, such that Plaintiffs recaptured their U.S. copyright interests in the Recorded Compositions and are the sole owners and administrators of the copyrights in and to the Recorded Compositions for the territory of the United States;

(b)    On the Second Claim a declaration that, upon reversion of their copyrights in the Recorded Compositions, Plaintiffs are entitled to 75% of the revenues derived from the worldwide (i.e., non-territory-bound) commercial exploitation of Plaintiffs' copyright interests in the Recorded Compositions, including with respect to commercial exploitation of derivative works, interpolations and samples thereof, as royalties attributable to Plaintiffs' U.S. copyright interests in the Recorded Compositions;

(c)    On the Third Claim, an Order directing Defendant to account and pay Plaintiffs all amounts due to Plaintiffs in connection with Defendant's and/or its administrator's

18

worldwide and U.S. commercial exploitation of Plaintiffs' copyright interests in the Recorded Compositions, including with respect to the commercial exploitation of derivative works, interpolations and samples thereof, from January 1, 2022 to the present, with prejudgment interest thereon.

(d)    On the Fourth Claim, an award of damages to Plaintiffs in an amount to be determined at trial, but in no event less than Seventy-Five Thousand Dollars ($75,000), plus prejudgment interest thereon.

(e)    An award to Plaintiffs of the costs, including their reasonable attorneys' fees, and disbursements incurred in prosecuting this action; and

(f)    Such other and further relief as the Court deems just and proper.

Dated: May 5, 2026

REITLER KAILAS & ROSENBLATT LLP
Attorneys for Plaintiffs

By: _/s/ Julie B. Wlodinguer_____
        Brian D. Caplan
        Julie B. Wlodinguer
885 Third Avenue, 20th Floor
New York, NY 10022
Tel. (212) 209-3050
bcaplan@reitlerlaw.com
jwlodinguer@reitlerlaw.com